# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Keith Fishlock, on behalf of himself and all others similarly situated, | |
| Plaintiff, | C.A. NO. 23-522-RGA |
| v. | |
| GLOBAL PLASMA SOLUTIONS INC., | **JURY TRIAL** |
| Defendant. | **DEMANDED** |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

PARTIES ........................................................................................... 6

JURISDICTION AND VENUE ........................................................... 7

FACTUAL ALLEGATIONS ................................................................ 8

   A.  THE MARKET FOR AIR TREATMENT SYSTEMS ............................ 8
   B.  GLOBAL PLASMA SOLUTIONS: THE COMPANY AND THE PRODUCTS ......... 12
   C.  GLOBAL PLASMA SOLUTIONS REPRESENTS TO CONSUMERS THAT ITS
      PRODUCTS WILL IMPROVE AIR QUALITY WITHOUT HARMFUL SIDE
      EFFECTS ............................................................................. 13
   D.  GLOBAL PLASMA SOLUTIONS' REPRESENTATIONS ARE FALSE, DECEPTIVE,
      AND MISLEADING ................................................................. 27
     a.  *Global Plasma Solutions' Representations to Consumers that Its
     Products Are Superior to Other Air Treatment Systems Are False,
     Deceptive, and Misleading.* ................................................... 27
     b.  *Global Plasma Solutions' Representations to Consumers that Its
     Products' Claims Are Supported By Sound, Independent Testing and Can
     Achieve Quantified Toxin-Removal Benchmarks Are False, Deceptive, and
     Misleading.* ......................................................................... 29
     c.  *Global Plasma Solutions' Representations to Consumers that Its
     Products Are Effective Against COVID-19 Are False, Deceptive, and
     Misleading.* ......................................................................... 32
   E.  PLAINTIFF AND CLASS MEMBERS RELIED ON GLOBAL PLASMA SOLUTIONS'
      FALSE REPRESENTATIONS ..................................................... 45
   F.  GLOBAL PLASMA SOLUTIONS CONCEALED THESE DECEPTIONS AND
      DEFECTS ............................................................................. 56

FACTS SPECIFIC TO PLAINTIFF ................................................ 70

CLASS DEFINITIONS AND ALLEGATIONS ................................ 72

CAUSES OF ACTION ..................................................................... 76

   COUNT I ............................................................................... 76
   DECEIT AND FRAUDULENT CONCEALMENT .................................. 76
   COUNT II .............................................................................. 80
   BREACH OF EXPRESS WARRANTY .............................................. 80

i

COUNT III ................................................................................... 85

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY ......................... 85

COUNT IV ................................................................................... 89

BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

.................................................................................................. 89

COUNT V .................................................................................... 93

VIOLATION OF STATE CONSUMER PROTECTION STATUTES ........................... 93

COUNT VI ................................................................................... 94

VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT ("DCFA"), ............... 94

COUNT VII .................................................................................. 96

UNJUST ENRICHMENT ................................................................... 96

**RELIEF DEMANDED ...................................................................... 99**

**JURY DEMAND ........................................................................... 100**

Plaintiff Keith Fishlock brings this action on behalf of himself and all others similarly situated against Defendant Global Plasma Solutions Inc. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1.      Global Plasma Solutions Inc. preys on people desperate to cleanse the air and protect themselves from ailments including the COVID-19 virus.

2.      Defendant represents that its Products[1] eliminate the COVID-19 virus, even though these Products do not.

3.      To further its deception – while also hiding significant defects in its Products – Defendant deceptively represents company-funded testing as "independent" while also using test conditions that are not representative of the real-world use of the Products.

---

[1] The Products included with this definition include all products that used Defendant's NPBI technology. Presently this includes the GPS-FC48-AC, GPS-FC24-AC, GPS-DM48-AC, GPS-FC-3-BAS, GPS-IMOD, GPS-IRIB-18, and GPS-IRIB-36.

4.     Defendant's "profits over people" scheme won the company acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members across the country.

5.      "The worst thing that can happen is installing a product you believe is keeping you safe, but it's not."[2]  But that is precisely what GPS is doing, instilling customers with a false sense of security through misleading claims.

6.     Further, Defendant overstates its Products' COVID-19 mitigation performance and uses methods that are "unvalidated"[3] and "under conditions that are not representative of actual application conditions."[4]

7.     For example, in one instance, Global Plasma Solutions used a chamber the size of a shoebox to support its claim that its Products

---

[2]Quote from Global Plasma Solutions Vice President of Sales David Archer. *Why Your Customers Should Care About Their Indoor Air Quality* https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

[3] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, MONTCLAIR LOCAL (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.

[4] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.

could kill COVID-19 for a home or school. In another instance, Global Plasma Solutions "blasted" the testing chambers with 27,000 ions per cubic centimeter – far in excess than concentrations achievable by its Products.

8.     When Defendant's Products have been independently tested in real world conditions, they consistently fail to achieve the results as represented by Defendant.

9.     COVID-19 has taken more than 1,090,000 American lives.

10.    In an effort to capture dollars from COVID-19 fear, Defendant markets directly to consumers seeking protection and relief from the virus.

11.    This tactic is "enhanced" by Defendant's marketing which provides information to consumers on how to obtain government funding to purchase Defendant's Products.

12.    These "free money" purchases boost the Defendant's revenues by not only taking from tax funds but also shifting these precious dollars away from effective means of virus mitigation.

13.    However, as Defendant knows, its Products suffer from defects which cause its Products to fail to meet its lofty representations.

Thus, the Defendant's representations that its products are a safe technology to cleanse the air of the COVID-19 virus is false, misleading, and designed to deceive consumers into paying a price premium and choosing its products over a competitor's product.

14.    In pursuit of "profits over people," Global Plasma Solutions uses many deceptive representations as described herein.

15.    For example, Defendant deceptively represented that its technology was installed in the White House for COVID mitigation: [5]

> A spokesperson for the company directed WIRED to research commissioned by the company showing the technology neutralized SARS-CoV-2 on surfaces and aerosols in lab settings, as well as case studies from customers including universities and the White House.

However, the technology was installed in 2018 – well before COVID-19 appeared.[6]

---

[5] Gregory Barber, *The Ionizer in Your School May Not Do Much to Fight Covid*, WIRED (March 26, 2021), https://www.wired.com/story/ionizer-school-not-fight-covid/.
[6] Additionally concerning, Defendant used the White House logo in its marketing to project legitimacy of its Products even though the White House logo may not be used for marketing purposes.

16.     Defendant manufactures, sells, and distributes the Products using marketing and advertising campaigns specifically targeted to consumers that are aware and fearful of the COVID-19 virus.

17.     For example, in CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[7]

18.     Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations.

19.     Defendant's fraudulent, deceptive, and misleading conduct violated and continues to violate the consumer protection statutes of multiple states. Further, Defendant breached and continues to breach its implied and express warranties regarding the Products. Additionally, Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of himself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

---

[7] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

## PARTIES

20.   Plaintiff is a citizen of Delaware and domiciled therein.

21.   Defendant Global Plasma Solutions, Inc. is a Delaware corporation with its principal place of business located in Charlotte, NC. Defendant manufactures, markets, and distributes its products throughout the United States.

22.   Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

23.   Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over the Defendant

because the Defendant is  incorporated in the State of Delaware; has

consented to jurisdiction by registering to conduct business in this state;

maintains sufficient contacts in Delaware; and otherwise intentionally

avails itself of the markets within Delaware through the promotion,

sale, marketing and distribution of its Products in and from Delaware,

which renders the exercise of jurisdiction by this Court proper and

necessary as Defendant is "at home" in Delaware.

25.     This Court has subject-matter jurisdiction over this proposed

class action pursuant to 28 U.S.C. § 1332(d), which, under the

provisions of the Class Action Fairness Act ("CAFA"), explicitly provides

for the original jurisdiction of the federal courts in any class action in

which at least 100 members are in the proposed plaintiff class, any

member of the plaintiff class is a citizen of a State different from any

defendant, and the matter in controversy exceeds the sum of

$5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the

total claims of individual members of the proposed Class (as defined

herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of

interest and costs. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

26.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is incorporated within this District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

<u>**FACTUAL ALLEGATIONS**</u>

**A. The Market for Air Treatment Systems**

27.     The COVID-19 pandemic has caused demand for air treatment systems (ATS) to skyrocket.

28.     In 2020, the ATS market grew by 57% and is expected to have a double-digit growth rate in each of the next two years.[8]

29.     Market growth at these rates is unprecedented.

30.     For example, one air filter company CEO was so overwhelmed with orders that he had to turn customers away and stated, "I've been in this business for 20 years and this is the most

---

[8] *Air Purifier Sales Surge in the U.S. Amid the COVID-19 Pandemic*, VERIFY MARKETS (January 26, 2021), https://www.globenewswire.com/news-release/2021/01/26/2164712/0/en/Air-Purifier-Sales-Surge-in-the-U-S-Amid-the-COVID-19-Pandemic.html.

chaotic time I've ever had in the air filter business."[9]  In summary, he described the demand from customers as "like toilet paper in April [2020] times two."[10]

31.    As a result of COVID-19's airborne transmission, residential and commercial customers sought air treatment systems to ensure safety.

32.    COVID-19 has taken more than 1,000,000 American lives.

33.    Certain underlying medical conditions that are relatively common in the population produce a significantly increased risk of death when a person is infected with COVID-19.

34.    For example, one common underlying condition is age. Compared to the CDC reference group, adults aged 30-39 are 45x more likely to die from COVID and 10x more likely to be hospitalized.[11]

---

[9] Will Feuer, *Airborne Transmission of Coronavirus Has Made High-End Air Filtration Systems More Popular Than 'Toilet Paper in April' As HVAC Systems Sell Out*, CNBC (October 15, 2020), https://www.cnbc.com/2020/10/15/airborne-transmission-of-coronavirus-has-made-high-end-air-filtration-systems-more-popular-than-toilet-paper-in-april.html.
[10] *Id.* (referring to the demand for toilet paper during the onset of the pandemic that led to shortages, fights, and arrests as consumers battled for toilet paper).
[11] Center for Disease Control, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated April 16, 2021).

35.     With each successive age group, these numbers increase drastically until hitting frightening numbers for people aged 65 and above:

| Age Range | Death | Hospitalization |
|:---:|:---:|:---:|
| 65-74 | 1300x | 40x |
| 75-84 | 3200x | 65x |
| 85+ | 8700x | 95x |

36.     To protect people, locations that have high amounts of "foot traffic" in an indoor setting have invested in safety precautions to mitigate the spread of COVID-19.

37.     The feeling of safety and security is pivotal to the public. As a result, there is strong demand for goods and procedures that "may make people feel safer without actually being substantially safer."[12]

38.     Installation of air treatment systems has been one of the most popular mitigation efforts.

---

[12]Lindsay Christians, *Cold Comfort: With Winter On Its Way, Madison Restaurants Scramble To Stay Alive*, THE CAPITAL TIMES (November 7, 2020), https://madison.com/ct/entertainment/dining/cold-comfort-with-winter-on-its-way-madison-restaurants-scramble-to-stay-alive/article_2fdc210d-f78e-55cb-a251-96fc41516a1e.html.

39.    Because of the strong likelihood of death for the elderly population, senior living facilities have invested heavily in air treatment systems.

40.    Because of the strong likelihood of children acting as super spreaders,[13] schools from coast to coast invested heavily in air treatment systems to protect not only the students and school staff but also their friends and family.

41.    Because of the strong desire to celebrate their faith in person, religious organizations throughout the country invested in air treatment systems to allow congregations to worship safely.

42.    In addition to these public areas, similar concerns caused demand and interest to swell with residential owners.

43.    One survey found that the COVID-19 pandemic caused a 54% increase in consumer focus for indoor air quality in their homes.[14]

---

[13] MGH News and Public Affairs, *Children's Role In Spread Of Virus Bigger Than Thought*, THE HARVARD GAZETTE (August 20, 2020), https://news.harvard.edu/gazette/story/2020/08/looking-at-children-as-the-silent-spreaders-of-sars-cov-2/.

[14] *New Survey Reveals Increased Concern for Air Quality and Safety in Homes*, PR NEWSWIRE (October 28, 2020), https://www.prnewswire.com/news-releases/new-survey-reveals-increased-concern-for-air-quality-and-safety-in-homes-301162159.html.

44.    The Wall Street Journal labeled clean air as the next luxury apartment perk, and Elisa Orlanski Ours, Chief Planning and Design Officer for Corcoran Sunshine, stated, "Air quality is now front of mind for our buyers."[15]

45.    Throughout every business sector and every home, demand for clean air and the equipment that creates the perception of clean air is growing exponentially.

46.    To harness this demand, companies, like Global Plasma Solutions, have increased marketing efforts and product lines.

**B. Global Plasma Solutions: The Company and the Products**

47.    Global Plasma Solutions was founded in 2008. The company's previous focus was providing energy savings solutions. However, when the COVID-19 pandemic hit, the company's focus shifted, and in CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[16]

---

[15] Katy McLaughlin, *CLEAN AIR: THE NEXT LUXURY APARTMENT PERK*, WALL STREET JOURNAL (December 9, 2020), http://www.wsj.com/articles/clean-air-the-next-luxury-apartment-perk-11607526064.

[16] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

48.    The backbone of Global Plasma Solutions' product line is its patented Needlepoint Bipolar Ionization technology (NPBI).

49.    NPBI is used in all seven of Defendant's Products.

### C. Global Plasma Solutions Represents to Consumers that Its Products Will Improve Air Quality Without Harmful Side Effects

50.    In marketing the Products, Defendant makes numerous representations regarding the performance and abilities of its Products and the benefits purchasers should expect to gain therefrom.

51.    This uniform, widespread marketing campaign is coordinated to present universal representations concerning the effectiveness of Defendant's Products and the NPBI technology.

52.    These representations fall into a few broad categories:

   a.   Representations that the Products are superior to other air treatment system technologies;

   b.   Representations that the Products produce cleaner air;

   c.   Representations that the Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes);

13

d. Representations that Defendant's assertions about the Products are based on "independent testing;"

e. Representations that attempt to capitalize on the COVID-19 pandemic.

53. These representations are false, misleading, and deceptive:

| Representation Category | False, Misleading, and Deceptive |
|---|---|
| Products are superior to other air treatment system technologies | Comparisons to other technologies are based on the other misrepresentations herein. |
| Products produce cleaner air | Independent studies show that the Products are not effective at cleaning the air in real world conditions. |
| Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes) | These benchmarks fail to be replicated in real world environments. |
| Defendant's assertions about the Products are based on "independent testing" | Defendant's testing is fundamentally flawed and biased because these company-funded studies are not "independent." Further, Defendant's test results are not replicated in real world conditions because Defendant's tests are carefully constructed in order to achieve the outcomes Defendant desires. |

14

| | Through a coordinated campaign to profit from COVID-19 fear, Defendant overstates the efficacy of its Products' ability to eliminate COVID-19. |
|---|---|
| Attempts to capitalize on the COVID-19 pandemic | |

54.    These representations were promulgated to the public through Defendant's website, social media, YouTube videos, testimonials, third party publications, and other media. Below is a non-exhaustive selection of the representations made by Global Plasma Solutions concerning its NBPI Products.

55.    Defendant represents that its Products are <u>superior to other air treatment system technologies</u>.[17]

   a.  "That's why GPS is committed to science and ongoing research to ensure we have **the safest**, **most effective technology on the market**." Charles Waddell, GPS' Founder and Chief Technology Officer.[18]

---

[17] Emphasis added throughout.
[18] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.

b. "Most important, **unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces.**"[19]

c. In a podcast interview, shared on the Global Plasma Solutions' official Facebook page on June 15, 2020, Founder and CTO, Charlie Waddell states:[20]

  i. "You know, half the filters and UV lights are what I consider passive devices, they sit there and they wait for stuff to come to them. **Our technology NPBI is actually going out into the space and seeking out these contaminants within the space. So that's really solving the problems as we see them today.** Where you have people talking coughing, sneezing, generating the actual contaminants in the space. So I would rather see a technology actively coming out into the space to treat those contaminants versus waiting

---

[19] Global Plasma Solutions, *PROJECT SPOTLIGHT: Boston Children's Hospital*, https://globalplasmasolutions.com/articles/project-spotlight-boston-childrens-hospital.
[20] Global Plasma Solutions' Official Facebook Page, June 15, 2020, https://www.facebook.com/globalplasmasolutions/posts/190279179097329.

for them to come back to the air handler to be reactive versus proactive."[21]

d. In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant's Founder and CTO:[22]

**% of SARS VIRUS CONTROLLED BASED ON TECHNOLOGY[1]**

| MERV Rating | Filter Only | Filter+UVC*** | Filter + Ionization*, ** |
|---|---|---|---|
| 6 | 6.2% | 10% | 34% |
| 7 | 7% | 12% | 61% |
| 8 | 11% | 19% | 84% |
| 10 | 12% | 35% | 89% |
| 13 | 46% | 84% | 97% |
| 15 | 71% | 97% | 99% |
| 16 | 76% | 98.80% | 99.90% |
| 17 (HEPA) | 99.90% | 99.99% | 99.999% |

*Ionization increases the filter efficiency 4-5 MERV levels – this column added by GPS
**Does not take into account ionization kills in the space and on surfaces
***UVC does not effectively kill airborne pathogens in high RH conditions[2]

---

[21] *Id.* at approximately the 4:00 minute mark.
[22] Global Plasma Solutions Presentation (conducted by Charlie Waddell), How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization, https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf.

17

e.  In a sales presentation from September 1, 2020, Defendant compares its technology vs. competitor technologies:[23]



56.  Defendant represents that its Products <u>produce cleaner air</u>.[24]

a.  "**CLEANER AIR**, NATURALLY"[25]

b.  "Through our needlepoint bipolar ionization or NPBI® technology, **we deliver clean indoor air** ."[26]

---

[23] Global Plasma Solutions Sales Presentation, <u>Better Air through Science</u>, September 1, 2020, <u>https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf</u> (slide 13).
[24] Emphasis added throughout.
[25] Global Plasma Solutions, <u>How It Works</u>, <u>https://globalplasmasolutions.com/how-it-works</u> (last visited May 5, 2021).
[26] *Id.*

18

c. "NPBI is a proactive approach to **cleaner air**."[27]

d. "This instantly results **in cleaner indoor air** and a safer environment."[28]

e. GPS products provide an affordable, effective and low-maintenance **solution for cleaner air**.[29]

f. "AN ENGINEERED SOLUTION FOR **CLEANER, SAFER** INDOOR AIR"[30]

g. "The combined effect is air that is **cleaner and safer** to breathe."[31]

h. In March 2021, Global Plasma Solutions appointed Edward Sobek as the company's first Chief Science Officer. In the press release announcing his arrival, Mr. Sobek states: [32]

---

[27] Global Plasma Solutions, *The American Rescue Plan Can Help Schools Reopen Safely*, https://globalplasmasolutions.com/articles/the-american-rescue-plan-can-help-schools-reopen-safely-with-air-purification-technology.

[28] *Id.*

[29] *Id.*

[30] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

[31] Global Plasma Solutions, *PROJECT SPOTLIGHT The Learning Experience*, https://globalplasmasolutions.com/articles/project-spotlight-the-learning-experience.

[32] Global Plasma Solutions, *Global Plasma Solutions® Appoints Edward Sobek as Chief Science Officer*, March 2, 2021, https://globalplasmasolutions.com/articles/indoor-air-quality-solutions-leader-

      i. "What is most compelling about NPBI is its ability to **clean air and surfaces** in the occupied space."

      ii. "This technology can help create **healthy environments** at home, at work, at school and beyond. I welcome the opportunity to further GPS' goal of improving indoor air quality for all."[33]

    i. "Our patented needlepoint bipolar ionization (NPBI®) technology is a **proactive approach to cleaner air**."[34]

57. Defendant represents that its Products <u>can achieve toxin-removal benchmarks</u>.[35]

    a. "**Within 24 hours of installation**, NPBI technology **effectively neutralized odors from all sources** entering these buildings."[36]

---

[33] global-plasma-solutions-appoints-edward-sobek-as-chief-science-officer (emphasis added).

[33] *Id.*

[34] Global Plasma Solutions, *The Japanese Industrial Standard for Ion Measurement*, https://globalplasmasolutions.com/articles/the-japanese-industrial-standard-for-ion-measurement.

[35] Emphasis added throughout.

[36] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.

b. For example, the following tables appear on both the Defendant's "Independent Testing" and "Pathogen Reduction" pages:

i.

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction |
|----------|-----------------|---------------------|-------------------|
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** |

ii.

| Pathogen | Time in Chamber | Rate of Reduction |
|----------|-----------------|-------------------|
| Tuberculosis | 60 minutes | **69.1%** |
| MRSA | 30 minutes | **96.2%** |
| Staphylococcus | 30 minutes | **96.2%** |
| E. coli | 15 minutes | **99.7%** |

iii.

| Pathogen | Time in Chamber | Rate of Reduction |
|----------|-----------------|-------------------|
| Norovirus† | 30 minutes | **93.5%** |
| Human Coronavirus 229E* | 60 minutes | **99.0%** |
| Legionella | 30 minutes | **99.7%** |
| Clostridium Difficile | 30 minutes | **88.9%** |

c. "The air purification system was able to target and reduce pathogens and odors **within just 24 hours of installation**."[37]

---

[37] Global Plasma Solutions, *PROJECT SPOTLIGHT: Clean Room Applications*, https://globalplasmasolutions.com/articles/project-spotlight-clean-room-applications.

d. "The GPS-iMOD **drastically reduced the exhaust fume odors within 24 hours** and **reduced the particles in the space by up to 85%**."[38]

58.    Defendant represents that <u>its assertions about the Products are based on "independent testing."</u>[39]

a. "This process is **proven by independent laboratory testing** to be both safe and effective."[40]

b. In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant's Founder and CTO:[41]

## *Independent Testing by World Renowned EMSL & ATS Labs*

---

[38] Global Plasma Solutions, *PROJECT SPOTLIGHT The University of Maryland, Baltimore*, https://globalplasmasolutions.com/uploads/customer-resources/Resource-Library/Case-Studies/University-of-Maryland-Case-Study.pdf (emphasis in original).
[39] Emphasis added throughout.
[40] Global Plasma Solutions, <u>Pathogen Reduction</u>, https://globalplasmasolutions.com/pathogen-reduction (last visited May 5, 2021).
[41] Global Plasma Solutions Presentation (conducted by Charlie Waddell), <u>How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization</u>, https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf.

c. On its website, under the "Independent Testing" page:[42]

## Independent Testing

We put our needlepoint bipolar ionization (NPBI®) technology to the test: Third-party testing confirms it limits the spread of viruses.

i.

PERFORMANCE VALIDATION

*Third-party testing confirms: GPS gets the job done*

Our results-driven technology fights pathogens and limits the spread of viruses.

ii.

59.    Defendant's representations concerning the <u>COVID-19 pandemic</u>.[43]

a. "While the **COVID-19 pandemic** has inspired virtually every industry to take steps toward ensuring cleaner, safer indoor air, Global Plasma Solutions (GPS) began tackling air purification long before the coronavirus emerged."[44]

---

[42] Global Plasma Solutions, <u>Independent Testing</u>, <u>https://globalplasmasolutions.com/independent-testing</u> (last visited May 5, 2021).
[43] Emphasis added throughout.
[44] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, <u>https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport</u>.

b. "**COVID-19 is top of mind**, of course, including the different mutations of the virus we're seeing come into the United States," Waddell said. "**NPBI creates additional peace of mind during this evolving pandemic.**"[45]

c. "**This pandemic may be the first most of us have seen, but it won't be the last**, and we need to be prepared. That's why GPS is committed to science and ongoing research to ensure we have the safest, most effective technology on the market."[46]

d. "Pathogens such as SARS-CoV2, **the new strain of coronavirus that causes COVID-19**, can reside on surfaces and be suspended in the air we breathe. NPBI technology is **designed to mitigate these harmful pathogens by safely creating and releasing ions** via a building's existing HVAC system."[47]

---

[45] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.
[46] *Id.*
[47] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

e. "In the case of **SARS-CoV2** and other pathogens, contact with positive and negative ions has microbicidal effects, ultimately disrupting their surface proteins and rendering them inactive. Independent laboratory studies have shown **that NPBI technology limits the spread of viruses such as SARS-CoV2**, MRSA and E. coli."[48]

f. "In addition, when ions come into contact with pathogens, such as the **SARS-CoV-2 virus that causes COVID-19**, they disrupt the pathogens' surface proteins. This, in turn, renders them inactive."[49]

| Pathogen | Time in Chamber | Rate of Reduction | Test Agency |
|----------|-----------------|-------------------|-------------|
| SARS-CoV-2 | 30 minutes | **99.9%** | Innovative Bioanalysis |

g. [50]

h. "Imagine an individual with **COVID-19** walks into a room in your office building. With the smallest of actions – like a cough or a sneeze – harmful pathogens have been released into the air. From that moment forward, anyone who walks

---

[48] *Id.*

[49] *Id.*

[50] Archived version of Defendant's website from October 24, 2020, https://web.archive.org/web/20201024175828/https://globalplasmasolutions.com/pathogen-reduction.

into the room is exposed to the virus. These scenarios happen countless times each day, and historically there have not been solutions to address the problem. That's where NPBITM comes in." Charlie Waddell, GPS Founder and CTO.[51]

i. "Though **a proven tool in the fight against COVID-19**, NPBI is just one critical measure in a comprehensive approach to improving IAQ and providing cleaner, safer indoor air."[52]

j. "…announced today industry-leading ionization testing results, demonstrating a **99.4% reduction rate on a SARS-CoV-2 (COVID-19)** surface strain within 30 minutes, the **first instance in which an air purification company has effectively neutralized SARS-CoV-2.**"[53]

---

[51] Charlie Waddell, *The Future of IAQ Lies in Needlepoint Bipolar Ionization*, HVAC INSIDER & REFRIGERATION (July 7, 2020), https://hvacinsider.com/the-future-of-iaq-lies-in-needlepoint-bipolar-ionization/.
[52] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.
[53] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.



k.

60.     Global Plasma Solutions' representations were largely repeated uncritically by news outlets, publications, press releases, social media, and other forms of media.

61.     Global Plasma Solutions' representations were used in the marketing efforts of its sellers, distributors, and other agents.

62.     But these representations failed to hold up when they were examined by independent academic studies and industry watchdogs.

### D. Global Plasma Solutions' Representations Are False, Deceptive, and Misleading

#### a. Global Plasma Solutions' Representations to Consumers that Its Products Are Superior to Other Air Treatment Systems Are False, Deceptive, and Misleading.

63.     As outlined above, Defendant represents NBPI as the safest, most effective technology on the market.

64.     These statements are not mere puffery because Defendant presents direct comparisons to other technologies throughout its uniform, wide scale marketing campaign.

65.     For example, the following table is used multiple times in

Defendant's marketing literature:

| | GPS NPBI™ | Other BPI | Corona Discharge | HEPA Filters | Carbon Filters | Ultraviolet (UV) | UV-PCO |
|---|---|---|---|---|---|---|---|
| No Harmful Byproducts | ● | | | ● | ● | | |
| Reduces Airborne Particles | ● | ● | ● | ● | | | |
| Reduces VOCs | ● | ● | ● | | ● | | ● |
| Reduces Pathogens | ● | ● | ● | ● | ● | ● | ● |
| Reduces Energy Cost | ● | ● | ● | | | | |
| Treats In-Room Air | ● | ● | ● | | | | |
| No Replacement Parts | ● | | | | | | |
| No Maintenance | ● | | | | | | |
| Simple To Install | ● | | | | | | |
| Low Total Cost | ● | ● | | | | | |

GPS NEEDLEPOINT BIPOLAR IONIZATION VS. OTHERS

66.     These statements are made by the Defendant in order to

siphon sales from the competitors that use other technologies to clean

the air.

67.     If the statements were true and accurately represented, then

Defendant's "superior technology" representations might be within the

bounds of the law.

68.     However, many of Defendant's representations are false,

misleading, and deceptive.

69.     When NPBI is compared to other technologies, "[existing]

proven measures that should be taken to address airborne transmission

risk include properly sized and maintained ventilation (mechanical and

natural), mechanical filtration (including portable HEPA filter units), and germicidal ultraviolet light systems. Such measures are practical and often can be easily implemented; many are not costly...."[54]

70.     As described in greater detail below, many of these comparisons are false, misleading, and deceptive, and solely created to induce sales of Defendant's Products.

**b. Global Plasma Solutions' Representations to Consumers that Its Products' Claims Are Supported By Sound, Independent Testing and Can Achieve Quantified Toxin-Removal Benchmarks Are False, Deceptive, and Misleading.**

71.     The Products fail to clean the air at the rates as claimed by its "independent testing."

72.     For example, in an attempt to improve cleanliness and efficiency, Boeing conducted a technical assessment of air ionization technologies.[55]

73.     One of the tested technologies was NPBI.

---

[54] Drs. Marwa Zaatari and Marcel Harmon, *Open Letter to address the use of Electronic Air Cleaning Equipment in Buildings*, April 12, 2021, https://medium.com/open-letter-to-address-the-use-of-electronic-air/no-to-ionizers-plasma-uvpco-bc1570b2fb9b (this letter is supported by 11 other doctors).
[55] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

74.     The test results in the Huntsville location found "minimal reductions in viral inactivation."[56]

75.     The test also found only "minimal reductions in surface bacteria viability by bipolar ionization."[57]

76.     Further, the Huntsville test found "no reductions in Staphylococcus aureus, Pseudomonas aeruginosa, Enterococcus faecalis, and Enterobacter cloacae with <20.6% or <0.1 log10 reduction over a 60 minute exposure duration."[58]

77.     The "New 787-10 Ground Testing" found the reductions in Escherichia coli and MS2 Bacteriophage to be far lower than needed for cabin disinfection.[59]

78.     At the end of the assessment, Boeing found:[60]

---

[56] *Id.* at 16.
[57] *Id.*
[58] *Id.*
[59] *Id.* at 20-21.
[60] *Id.* at 22.

The use of air ionization in an airplane remains inconclusive as a methodology for deployment during the SARS-CoV-2 virus pandemic. Boeing's limited testing was unable to replicate supplier results in terms of antimicrobial effectiveness. The systems were unable to properly deliver and maintain the necessary ion levels in the airplane to achieve disinfection. Similarly, laboratory-based tests did not show proper rates of disinfection with higher ion concentrations. It is pertinent to be able to demonstrate effective performance in an airplane environment given aircraft installation constraints.

79.    In summary, "Boeing's current position is that air ionization has not shown significant disinfection effectiveness for further inclusion in the Confident Travel Initiative Program."[61]

80.    Boeing's results and conclusions stand in stark contrast to Defendant's statements concerning NPBI's effectiveness in an airplane environment:[62]

In the laboratory, a test was conducted to mimic ionization conditions like that of a commercial aircraft's fuselage. Based on viral titrations, it was determined that at 10 minutes, 84.2% of the virus was inactivated. At 15 minutes, 92.6% of the virus was inactivated, and at 30 minutes, 99.4% of the virus was inactivated.

---

[61] *Id.*

[62] *Global Plasma Solutions (GPS) Launches Needlepoint Bipolar Ionization To Virtually Eliminate Static SARS-CoV-2 with Proprietary NPBI™ Technology*, PR NEWSWIRE (September 15, 2020), https://www.prnewswire.com/in/news-releases/global-plasma-solutions-gps-launches-needlepoint-bipolar-ionization-to-virtually-eliminate-static-sars-cov-2-with-proprietary-npbi-tm-technology-860417185.html.

### c. Global Plasma Solutions' Representations to Consumers that Its Products Are Effective Against COVID-19 Are False, Deceptive, and Misleading.

81.     From the early days of COVID-19, Global Plasma Solutions viewed the pandemic as a potential windfall for its technology and Products.

82.     Two days before the World Health Organization increased the status of COVID-19 from an epidemic to a pandemic,[63] Global Plasma Solutions issued a press release in an attempt to capture the new burgeoning market.[64]

83.     The press release – entitled "Indoor Air Quality Technology Company Responds to Coronavirus" – was a flag-planting moment for Global Plasma Solutions. From the point onward, the company's focus shifted and became "all about pathogens and coronavirus and Covid-19."[65]

---

[63] Kathy Katella, *Our Pandemic Year—A COVID-19 Timeline*, YALE MEDICINE (March 9, 2021), https://www.yalemedicine.org/news/covid-timeline.

[64] Global Plasma Solutions, *Indoor Air Quality Technology Company Responds to Coronavirus*, March 9, 2020, https://globalplasmasolutions.com/articles/indoor-air-quality-technology-company-responds-to-coronavirus.

[65] Quoting CEO Glenn Brinckman. Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

84.    On June 10, 2020, a date where COVID-19 killed 860 Americans, Defendant published a press release entitled "GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology."[66]

85.    In this press release, Defendant "announced today industry-leading ionization testing results, demonstrating a 99.4% reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes, the first instance in which an air purification company has effectively neutralized SARS-CoV-2."[67]

86.    In that same release, Global Plasma Solutions' founder and CTO declared, "The testing results we achieved through our proprietary needlepoint bipolar ionization technology clearly demonstrate that Global Plasma Solutions is the gold standard in air purification."

87.    Building from the themes in its press releases, Defendant describes its Products as "proven tool[s] in the fight against COVID-19."[68]

---

[66] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.
[67] *Id.*
[68] *Id.*

88.   This "proof" comes from "[i]ndependent laboratory studies [that] have shown that NPBI technology limits the spread of viruses such as SARS-CoV2."[69]

89.   These results are summarized into a simple table:

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction | Test Agency |
|---|---|---|---|---|
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** | Innovative Bioanaylsis |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** | Innovative Bioanaylsis |

90.   The results and Defendant's statements are interpreted in a similar fashion by consumers and the general public.

---

[69] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

a. 

b.  "We've done our homework on this. It's the only company
that we found that claimed that they could kill the COVID-
19 virus."[70]

### Charlotte City Club Installs Ion System that Claims to Kill COVID-19

c.                                                                          [71]

---

[70] Dana Winter, *Faith Academy Gets New Technology Killing COVID-19 In The Air*,
WKRG (July 22, 2020), https://www.wkrg.com/local-news/faith-academy-gets-new-technology-killing-covid-19-in-the-air/.

[71]Rob Thomas, *Charlotte City Club Installs Ion System that Claims to Kill COVID-19*, CLUB AND RESORT BUSINESS (July 14, 2020),
https://clubandresortbusiness.com/charlotte-city-club-installs-ion-system-that-claims-to-kill-covid-19/.

d. "The Indiana Welcome Center is installing a state-of-the-art bipolar ionization system to kill COVID-19…Third-party testing has shown the system kills 99.47% of SARS-CoV-2, the disease that causes COVID-19, within 30 minutes, Project Manager Doug Lavin said. "It's like having Purell and hand sanitizer in the air," he said. "It starts killing viruses in the air and on surfaces immediately. It has a 75% kill rate within five minutes, an 85% kill rate within 10 minutes, and a 92% kill rate within 15 minutes. Within half an hour, the kill rate is 99.47%."[72]

e. "In September, Abiding Savior Lutheran Church and School will have an air purification system installed to assist in mitigating Covid-19 and other viruses, allergens and bacteria. "The installation of this air purification system will help keep our air healthier and surfaces cleaner in an environmentally friendly way. Not only has testing proven

---

[72] Joseph S. Pete, *Indiana Welcome Center Installs Bipolar Ionization System To Kill COVID-19*, NORTHWEST INDIANA TIMES (July 23, 2020), https://www.nwitimes.com/business/local/indiana-welcome-center-installs-bipolar-ionization-system-to-kill-covid-19/article_f88835a1-2d72-56a6-acff-f6653178cb54.html.

remarkable results in the killing of SARS-Cov-2, but it will also help our students who struggle with seasonal allergies," said Brian Ryherd, Principal of Abiding Savior Lutheran School. Global Plasma Solutions is the first air purification solution to test SARS-CoV-2, achieving a 99.4% reduction of the surface strain within 30 minutes. See detailed information below [reproduces Defendant's June 10, 2020 Press Release]."[73]

91.    Global Plasma Solutions' representations concerning COVID-19 were largely repeated uncritically by news outlets, publications, press releases, social media, and other forms of media.

92.    But these representations failed to hold up when scrutinized by the nation's top engineering and environmental experts.

93.    "The consistent message from experts is to avoid being too creative with airborne solutions. Stay away from worthless — or even dangerous — add-ons to filtration like bipolar ionization.…"[74]

---

[73] Abiding Savior Lutheran School, *Keeping Our Students* Healthy, July 24, 2020, https://www.aslsonline.org/news/2020/7/24/keeping-our-students-healthy.
[74] Drs. Alex Huffman, Delphine Farmer, and Marina Vance, *Opinion: We Need Safer Air In Colorado's Schools — But Let's Be Careful How We Get There*, THE COLORADO SUN (April 23, 2021), https://coloradosun.com/2021/04/23/safer-air-schools-opinion/.

94.     Needlepoint bipolar ionization is "an emerging technology" with "little research [ ] available that evaluates it outside of lab conditions."[75] Further, "as typical of newer technologies, the evidence for safety and effectiveness is less documented than for more established ones...."

95.     With minimal evidence to support the technology, any representation that it is effective against COVID-19 must be based with solid science and consistent with real world application.

96.     However, the scientific community has concluded that this technology – and the testing methods used by Defendant – lack the foundation to support these lofty representations.

97.     For example, Dr. F. James Lo, an assistant professor of engineering at Drexel University states that ionization technology will "clean the air only when it [passes] through the purifier, which means it helps very little in terms of person-to-person localized virus transmission."[76]

---

[75] United States Environmental Protection Agency, *Air Cleaners, HVAC Filters, and Coronavirus (COVID-19)*, March 22, 2021, https://www.epa.gov/coronavirus/air-cleaners-hvac-filters-and-coronavirus-covid-19.

[76] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22,

98.     Similarly, an engineering professor from the University of North Carolina Chapel Hill believes that "[a] cheap portable HEPA filter would work many times better and have fewer side effects (possibly ozone or other unwanted chemistry)."[77]

99.     Defendant's use of company-funded, specialized studies are not independent as represented by Global Plasma Solutions.

100.    Further, the studies are designed to support Defendant's deceptive, misleading, and false lofty representations and are not applicable to real world conditions.

101.    In other words, in a real world application, ionization is not effective against COVID-19 transmission.

102.    Defendant's representations are not only false and misleading but also the Defendant misrepresents the validity of its testing that builds the foundations for its representations.

_____

2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.

[77] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/.

103.  Dr. Monica Mazurek, a professor in civil and environmental engineering at Rutgers University, describes the Defendant's COVID-19 representations as "unvalidated" and the tests presented by Defendant are under unmonitored conditions.[78]

104.  Further, she outlines her specific concerns, "Where is the data? Where are the facts? Where are the monitoring data?"[79]

105.  Simply, the Products "do not prevent exposure and transmission of COVID-19."[80]

106.  Dr. Sarah F. Evans, an Assistant Professor in the Department of Environmental Medicine and Public Health and a member of the Institute for Exposomic Research at the Icahn School of Medicine at Mount Sinai, also has concerns about Defendant's COVID-19 representations.[81]

107.  After review, Dr. Evans and her "team of pediatricians, scientists, occupational medicine doctors and industrial hygienists have

---

[78] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, MONTCLAIR LOCAL (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.
[79] *Id.*
[80] *Id.*
[81] *Id.*

concerns about the safety and efficacy of emerging air cleaning," and ultimately recommended against Defendant's Products being used in schools.[82]

108.  The National Air Filtration Association website states, "There is no direct scientific evidence of benefit, but some reduced exposure can reasonably be inferred based on the ability of some filters to remove particles that contain a SARS-CoV-2 virus."[83]

109.  However, mere inferences are insufficient to support the prominent representations made by Defendant.

110.  Dr. William Bahnfleth, a professor of architectural engineering at Pennsylvania State University also doubts the soundness of the testing methods implemented. He believes that "[m]uch of the proof of their performance is in the form of laboratory studies commissioned by manufacturers that are often performed under

---

[82] *Id.*
[83] National Air Filtration Association, *COVID-19 (Corona Virus) and Air Filtration Frequently Asked Questions (FAQs)*, https://www.nafahq.org/covid-19-corona-virus-and-air-filtration-frequently-asked-questions-faqs/.

conditions that are not representative of actual application conditions."[84]

111.  In response to these commissioned studies, Dr. Bahnfleth wrote, "Many in the scientific community are skeptical."[85]

112.  Dr. Amesh Adalja, a senior scholar at the Johns Hopkins University Center for Health Security, warns that untested representations that air treatment systems can stop the spread of COVID will give people "a false sense of security."[86]

113.  When additional details about Defendant's testing methods were revealed, this "false sense of security" generated significant public concern.

114.  One review of Defendant's testing methods and representations was summarized: [87]

---

[84] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.
[85] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.
[86] *Id.*
[87] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-

Last summer, Global Plasma Solutions wanted to test whether the company's air-purifying devices could kill Covid-19 virus particles, but **could find only a lab using a chamber the size of a shoebox** for its trials. In the company-funded study, the virus was blasted with 27,000 ions per cubic centimeter. The company said it found a 99% reduction of virus. The report **doesn't say how this reduction was measured**, and in September, the company's founder incidentally mentioned that **the devices being offered for sale would actually deliver a lot less ion power -- 13 times less -- into a full-sized room**.

115.  Further, one testing flaw was described as "[Global Plasma Solutions] nonetheless used the shoebox results in marketing its device heavily to schools as something that could combat Covid in classrooms far, far larger than a shoebox."[88]

116.  Glenn Morrison, an engineering professor at the University of North Carolina Chapel Hill, believes that the Products' COVID-19 reductions would not be very effective under normal building conditions, outside a test chamber.[89]

117.  Defendant's funding of its own studies not only flies in opposition to Defendant's testing representations but also presents a clear conflict.

---

air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/(emphasis added).

[88] *Id.*

[89] *Id.*

118.   Relying on company-funded studies, as one concerned parent stated, "is like only listening to advice from Philip Morris as to whether smoking is safe or not."[90]

119.   When Defendant's Products are tested in real world conditions, they fail to meet their marketed "independent testing" results.

120.   When Boeing tested the technology – under real world conditions – to see if it could be successfully implemented in its aircraft, it found:[91]

    a. "Use of air ionization in an airplane remains **inconclusive** as a methodology for **deployment during the SARS-CoV-2 virus pandemic**."

    b. "Testing was **unable to replicate supplier results** in terms of antimicrobial effectiveness."

    c. "The systems were **unable to properly deliver and maintain** the necessary ion levels in the airplane to achieve disinfection."

---

[90] *Id.*
[91] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

d. "Similarly, laboratory-based tests **did not show proper rates of disinfection** with higher ion concentrations."

## E. Plaintiff and Class Members Relied on Global Plasma Solutions' False Representations

121. Defendant's misrepresentations and false statements were woven into an extensive and long-term advertising campaign conducted during the statutory period and accelerating during the COVID-19 pandemic. Defendant spent millions of dollars to spread the misrepresentations and material omissions about the Products through its own website, social media, YouTube, interviews with traditional media, and other mediums.

122. Defendant and its founders, executives, and employees authored these false and misleading representations and propagated them through various outlets, including through third party publications who repeated the claims without question. Defendant's intent was to generate substantial publicity in light of the COVID-19 pandemic that would attract customers and construct a veneer of credibility around their falsehoods. They largely succeeded.

123.  When questions about NPBI's efficacy were published, Defendant responded by filing lawsuits.[92]

124.  These misleading advertisements and representations were viewed by millions of people and drove sales of the Products throughout the country. The misleading representations grew like a virus because many purchasers were struggling small businesses which "boasted" about COVID-19-fighting investments in order to make customers feel safe.

125.  Facebook and other social media provided a common forum for the distribution of these "COVID safety announcement" posts which largely re-broadcast Defendant's representations:

---

[92] *See Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 3:21-cv-02884-TSH (N.D. Ca. 2021); *Global Plasma Solutions, Inc. v. D Zine Partners, LLC and Marwa Zaatari*, 3:21-cv-00884-D (N.D. Tx. 2021);  *Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 1:21-cv-01059-MHC (N.D. Ga. 2021).



**The Extreme Studio** is at **The Extreme Studio**.
January 23 · Basehor, KS · 🌐

We are so excited that we now have this Needlepoint Bipolar Ionization System at The Extreme Studio. This system mitigates airborne and surface pathogens including Covid 19. We are the only studio/gym in town offering this system!!

**modernebarn** · Follow
Moderne Barn

275 likes
modernebarn ATTN CUSTOMERS! Many of you are still not aware Moderne Barn installed a state of the art air purification system. GPS Needlepoint Bipolar Ionization @gps_dr improves indoor air quality by eliminating airborne particulates, pathogens and odor causing VOCs. This patented technology has been integrated with our HVAC system and is fully operational throughout the restaurant. We are committed to providing a safe environment while continuing to follow all protocols to ensure everyone's safety. 🤎
View all 25 comments

**St. Catherine University**
@StKate

As plans for our safe return to campus continue, St. Kate's is the first educational institution in #Minnesota to install the **NeedlePoint BiPolar** Ionizing units that kills viruses like #COVID19, flu, tuberculosis, and more.
minnesota.cbslocal.com/2020/06/23/dev...

#mystkates #leadandinfluence

Device On Good Day Cafe's HVAC System Purifies Air Amid COVID-19 Pandemic
minnesota.cbslocal.com

47

**Don Carter Lanes**
Mar 5 · 🌐

We just made the air cleaner for our bowlers and our staff. GPS Needlepoint Bipolar Ionization Air Filters. This technology will make our indoor air CLEANER & SAFER! The video link below explains how the filters work.
http://bit.ly/815BowlingCentersAirFilters



🇺🇸❤️😮 13                                   3 Shares

👍 Like          💬 Comment          ↪ Share



**barre3 (Edina)**
7h · 🌐

Breathe fresh, breathe happy 😊

Did you know that we upgraded and installed a new air filtration system from Global Plasma Solutions back in June 2020?! It's here to stay, so whether you are joining us in studio or you plan to return in the future– we are making sure to keep you safe, healthy and our air as clean as possible!

GPS Needlepoint Bipolar Ionization improves indoor air quality by eliminating airborne particulates, pathogens and odor causing VOCs. This patented technology has been integrated with our HVAC system. Swipe to read more!

📷 @kristendyer
#barre3edina #airfiltration #cleanair #globalplasmasolutions



126.  Moreover, many of Defendant's images and diagrams are reproduced in these posts:

**Summit Salon Studios**
Feb 25 · 🌐

We've partnered with GPS: A PROVEN PROCESS TO CLEAN THE AIR

Pollutants, dust, dander, pollen, smoke and even pathogens such as mold, viruses and bacteria all can be suspended in the air we breathe, even when you don't see them.

Their patented needlepoint bipolar ionization technology safely creates and releases ions into the airstream using your existing HVAC system as the delivery method.
#globalplasmasolutions #cleanairsalon #cleanair #summitsalonstudios #fortcollinshairstylist #northerncoloradohairstylist #timnathhairstylist #greeleyhairstylist #lovelandhairstylist #wellingtonhairstylist #staysafe #covidprecautions #goingaboveandbeyond



**Renaissance Square**
Jan 14 · 🌐

Ownership at Renaissance Square is investing in tenants' health and wellness!  Our valued service partner @sunmechanicalcontracting is in the final stages of installing Global Plasmas Solutions (@gps_dr) Needlepoint Bipolar Ionization System to safely clean the indoor air at Ren Square!  This remarkable project is one of several enhancements at Ren Square to provide cleaner air, naturally! #globalplasmasolutions #sunmechanicalcontracting #rensquarephx #DTPHX #healthandwellness #hvac #leeandassociatesaz



👍 2

👍 Like          💬 Comment          ↪ Share

127.   Plaintiff was familiar with Defendant's representations regarding the superiority of its NPBI technology over other technologies for creating a clean air environment and the effective destruction of COVID-19. This was a critical selling point for Plaintiff, as Plaintiff hoped to purchase the most effective air treatment system available. And this was core theme in Defendant's advertising.

128.   Defendant's marketing focusing on the superiority of its technology even led to organizations and businesses creating fundraisers to purchase Defendant's Products. For example:




129.   The Class Members also relied on various other misrepresentations and material omissions made by Defendant in purchasing the Products. Many Class Members were impressed by Defendant's claims that the Products are capable of achieving quantified benchmarks (for example, that its technology can reduce COVID-19 by 98.33% within 60 minutes), which were typically communicated in text, tables, and graphs. But these claims are misleading as they are the results of controlled test conditions and have little relevance to the capabilities of the Products when operating in the real world.

130.   Defendant's claims were bolstered by Defendant's assertion it was communicating the results of "independent testing," and many Class Members found this compelling. But it is now clear that these tests were anything but independent tests as they were critically flawed and funded by Defendant.

131.   Additionally, this is confirmed by the independent testing conducted by professors at the Illinois Institute of Technology, Portland State University, and Colorado State University.[93]

132.   Defendant's messaging to consumers included detailed information concerning the CARES ACT.

133.   For example, on its website, it has an entire page dedicated to the topic:[94]

## How to Channel the CARES Act into Cleaner, Safer Indoor Air

134.   On this page, Defendant provides the roadmap for purchasers to obtain government funding to purchase its Products. For example: [95]

    a.   "Your company may be able to **tap into federal funds** to

        improve indoor air quality and fight pathogens such as

---

[93] *See* Yicheng Zeng, Prashik Manwatkar, Aurélie Laguerre, Marina Beke, Insung Kang, Akram S. Ali, Delphine K. Farmer, Elliott T. Gall, Mohammad Heidarinejad, Brent Stephens, *Evaluating A Commercially Available In-Duct Bipolar Ionization Device For Pollutant Removal And Potential Byproduct Formation*, BUILDING AND ENVIRONMENT, Volume 195, 2021, 107750, ISSN 0360-1323, https://doi.org/10.1016/j.buildenv.2021.107750.

[94] Global Plasma Solutions, *How to Channel the CARES Act into Cleaner, Safer Indoor Air*, https://globalplasmasolutions.com/articles/how-to-channel-the-cares-act-into-cleaner-safer-indoor-air.

[95] *Id.* (emphasis added).

COVID-19. Several provisions outlined in new legislation allow schools and universities, health care providers and small businesses **to tackle air quality improvement projects with minimal financial impact**."

b. "Small Businesses: As payments from the second round of the Paycheck Protection Program (PPP) begin rolling out, small businesses can apply funds to utility expenses and other related costs as a result of the COVID-19 pandemic."

135.   Purchasers relied upon these representations that they were obtaining a product that would not only make the air cleaner but also eliminate the COVID-19 virus. For example, numerous purchasers used CARES ACT funds to pay for Defendant's Products:





136.  One critical factor for Plaintiff and Class Members' decision to purchase the Products was the belief that it could safely protect them from COVID-19, and that the representations made by Defendant were based on sound, scientific studies.

137.  Defendant amplified its deceptions in many venues over a multi-year period with the intent to instill in consumers the belief that the Products were vastly superior to existing technology and capable of providing safe, clean air that lowers, removes, and eradicates the COVID-19 virus. Plaintiff and the Class Members saw these claims and relied on them in purchasing the Products, believing that they were

buying the best air treatment systems available when in fact they were purchasing systems that are largely ineffective.

## F. Global Plasma Solutions Concealed these Deceptions and Defects

138.  Defendant designed, manufactured, marketed, and sold the Products throughout the United States while knowingly concealing these defects and deceptions.

139.  As described by independent testing sources, the Products are incapable of performing as marketed. The Products are not able to "safely" clean the air of the COVID-19 virus. Consequentially, Defendant's claims regarding the performance, capabilities, and therapeutic benefits of the Products are false, deceptive, and misleading.

140.  During the Class Period, Defendant actively concealed the defects in the Products.

141.  For example, Defendant's CEO, Glen Brinckman advised employees to delete emails, texts, records, and other documents.[96]

---

[96] *Global Plasma Solutions Inc v. D Zine Partners LLC*, 3:21-cv-00884, (N.D. Tex.), ECF No. 376-1, pp. 188. 220-21.

KEITH GARRIS:  We'll have the discussion on
Monday.  He'll back on Sunday night.  I'll pull whatever
I have to.  If I've got to go talk to Alper or any other
IT guy and say hey, how do we pull this stuff out of
this these files.  Did GPS -- my concern, my true
concern is I believe I have that information.  I did
tell Marwa today that Glen Brinkman, the CEO when I was
in the office last year in like October, November had me
in his office and asked me to delete email text in front
of him and he did the same at that point in time.  As a

good soldier I did it.  As an employee I did it, okay,
and I can show you that I had texts since then, but
everything prior to that.  And now I understand why, and
they probably removed all emails and communications that
transpired and whatnot with all the testing that has
happened.

* * *

KEITH GARRIS:  Whether it's personal or
business, they never provided me a company phone, so it
would always be my personal property.  So that may be
the only saving grace that we have at this point in
time.  I'd have to go back through.  I know Glen made me
delete my texts and messages to him, and he did the same
last year about a year ago at this time, so I would --
MARWA ZAATARI:  My understanding, if you have
an iPhone, you can delete the text messages from the
cloud, from my iCloud.
KEITH GARRIS:  That's what I'm wondering.  If
I can pull Glen's from the cloud, yes.  Let me go find
out.  Let me call --
MARWA ZAATARI:  So Keith, I need one text
message.
KEITH GARRIS:  Glen's is going to be really
important because Glen -- it was very evident they were
going to remove and delete any evidence that they may
have and information that would -- communications that

they may have.  I guarantee without doubt that all email communications that I had, Charlie had and anybody else within our organization had, Kevin Boyle, Glen or anybody else, conference calls, webinars and all that stuff, all that with Boeing and the labs and (inaudible) and all that regarding Boeing, Boeing texts had been deleted or removed.

    MARWA ZAATARI:  Yeah.

    KEITH GARRIS:  They wanted to come after me when I deleted, when I cleaned out my computer before I returned it I did a Z deleted.

    MARWA ZAATARI:  They're trying to hide something so it's obvious.  Why would he ask you to delete text messages.  It's unheard of for him to ask you to delete text messages after they sued me, they sued Bud, and after the class action lawsuit, you know.

142.  Defendant knew that it's Products failed to safely clean the air of COVID-19 because, in part, it was shown to be ineffective in internal testing that was suppressed by Defendant.

143.  When scientists refuted Defendant's claims, Defendant implemented a coordinated litigation campaign to silence the truth.[97]

**Keith Garris:**  —they were scared.  They were scared with you and Bud's comments and, and claims and everything else.  And so they did, uh, instead of, instead of being defensive, they got on the offensive with you and Bud.  And, uh, and that's their big law firm and their, you know, these, these McGuireWoods guys and their, their, they were on a lot of [inaudible] calls with us and explaining to us what was going on, these sales guys.

---

[97] *Global Plasma Solutions Inc v. D Zine Partners LLC*, 3:21-cv-00884, (N.D. Tex.), ECF No. 376-1, p. 133.

144.  As part of this coordinated campaign, Defendant sued academic journals that published academic articles that exposed Defendant's deceptions in an attempt to further conceal the truth.[98]

145.  After the pandemic ended and demand for Defendant's Products evaporated, Defendant settled the majority of the cases it filed against scientists attempting to reveal the truth.[99]

146.  When testing of the Products resulted in negative outcomes, Defendant suppressed or altered the results.[100]

---

[98] *See Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering.* 4:21-cv-02884 (N.D. Cal.); *Global Plasma Solutions Inc v. D Zine Partners LLC,* 3:21-cv-00884, (N.D. Tex.); *Global Plasma Solutions, Inc. v. Elsevier Inc.*, 3:22-cv-00034 (W.D. N.C.).

[99] *Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering.* 4:21-cv-02884 (N.D. Cal.), ECF No. 81; GPS, *GLOBAL PLASMA SOLUTIONS, INC.'S LAWSUIT AGAINST DR. MARWA ZAATARI, D ZINE PARTNERS LLC, AND ENVERID SYSTEMS INC. COMES TO A RESOLUTION* (Mar. 23, 2023), https://gpsair.com/articles/global-plasma-solutions-inc-s-lawsuit-against-dr-marwa-zaatari-d-zine-partners-llc-and-enverid-systems-inc-comes-to-a-resolution.

[100] *Global Plasma Solutions Inc v. D Zine Partners LLC*, 3:21-cv-00884, (N.D. Tex.), ECF No. 376-1, p. 122.

**Marwa Zaatari:** …it was tested beyond the, beyond, it was not only negative and we are bipolar.  So to discredit the test?

**Keith Garris:** They did bipolar for two hours.  The next day we did negative ions suppressing the positives just to see the results 'cause we didn't get any results with bipolar.

**Marwa Zaatari:** Yes.  Yeah.  Another point they say..

**Keith Garris:** Charlie, Charlie said, "Yes, they put black electrical tape over the positive ions.  There's a way you can find out positive ions, would be putting the meter over the…

**[00:24:30]**

**Keith Garris:** Hold one, hold one of them, put the meter over it and you can see… (background computer noise) Sorry about that one of my things just turned on, my computer.  So, um..

**Marwa Zaatari:** So they lied, Keith.  Charlie lied.  Glenn Brinckman writing this rebuttal that, you know, uh, Boeing don't know what they're doing and no one helped them with the protocol and they suppressed that.

**Keith Garris:** Oh yeah.

147.  The concealment of tests showing the Products'
ineffectiveness were suppressed by decision makers high in the
company.[101]

**Marwa Zaatari:** So Keith, what's, what's, you keep mentioning Falfurrias, you know, Ken Walker, the chairman of the board of GPS, he knew about the, like, do they tell him that, you know, "We lied, the results of the Boeing report are very bad and this is what we're gonna, we're gonna lie and tell the market a different story."  Was he involved in this?

**[00:26:00]**

**Keith Garris:** Oh, absolutely.  But he'll, everybody'll deny it.  Yeah. Glenn would say, "I wasn't involved in testing."  Then why did you pay and why did you authorize and why did you send emails, text, and many things to me, Keith Garris on, uh, on, on, "How's the results?  How's the testing?"

---

[101] *Global Plasma Solutions Inc v. D Zine Partners LLC*, 3:21-cv-00884, (N.D. Tex.), ECF No. 376-1, p. 123.

148.  To further the deception, Defendant staged tests with altered devices that were knowingly staged in conditions that could not be replicated in real world conditions.[102]

> **Marwa Zaatari:**  But Keith, actually it's great that you bring this point because for the life of me, I cannot figure it out.  So, Charlie Waddell say, "1500 ions per centimeter cube."
>
> **Keith Garris:**  I heard it went to 5,000.  Now it went to, it went from 1500 and then it went up to like, uh, 2,500 or 2000 or 2,500.
>
> **Marwa Zaatari:**  But why?
>
> **Keith Garris:**  Went up to 5000, but they keep changing.
>
> **Marwa Zaatari:**  Yeah, they keep changing.  But basically like, let's say, you know, it's between 1500, let's say to 2,500.  Why, when they did the Innovative Bioanalysis lab...
>
> **[00:31:30]**
>
> **Marwa Zaatari:**  …why did GPS choose a very high level of ions?  10,000, 18, 27?
>
> **Keith Garris:**  Why did they choose something that's not realistic in the real world?
>
> **Marwa Zaatari:**  Why?
>
> **Keith Garris:**  They can't get that with an iMOD down through the duct work into the space, it, it will die.  They last 60 seconds and they die and then they, and you know, and the cost of getting 27,000 plus

---

[102] *Global Plasma Solutions Inc v. D Zine Partners LLC*, 3:21-cv-00884, (N.D. Tex.), ECF No. 376-1, pp. 127-28.

ions into a space, you can do it in some spaces.  The cost of doing that…

**[00:32:00]**

**Keith Garris:**  is not worth the price for people to pay for it.

**Marwa Zaatari:**  Exactly.

**Keith Garris:**  I mean, would cost, what would cost for a $25,000, uh, unit for a couple of air handlers in the, in the rooftops or the, the pit house for a section of a school.  Say there's two 25, 25-ton units and it costs, install everything $25,000 for two of them, right?  For like six classrooms, five, six classrooms.  Um, you would get maybe 3 to 4,000 maybe ions, maybe.

**[00:32:30]**

**Keith Garris:**  And, and to get the 27,000 that you would need, first of all you would have to wire and bring, um, electrical to, um, the units in the duct.  And, and the labor alone would be astronomical to do that, to get people do it.  And the units of those duct mounted units is just, it would be $100 thousand dollars.  You know?

**\*\*\***

ions into a space, you can do it in some spaces.  The cost of doing that…

**[00:32:00]**

**Keith Garris:**  is not worth the price for people to pay for it.

**Marwa Zaatari:**  Exactly.

**Keith Garris:**  I mean, would cost, what would cost for a $25,000, uh, unit for a couple of air handlers in the, in the rooftops or the, the pit house for a section of a school.  Say there's two 25, 25-ton units and it costs, install everything $25,000 for two of them, right?  For like six classrooms, five, six classrooms.  Um, you would get maybe 3 to 4,000 maybe ions, maybe.

**[00:32:30]**

**Keith Garris:**  And, and to get the 27,000 that you would need, first of all you would have to wire and bring, um, electrical to, um, the units in the duct.  And, and the labor alone would be astronomical to do that, to get people do it.  And the units of those duct mounted units is just, it would be $100 thousand dollars.  You know?

62

***

**Keith Garris:**  —or kill rate.  Later, they came back and they used a more robust GPS unit and turned on the fans and they, and they ran it at 27,000 positive negative ions and showed a 99.4 in 30 minutes. Right?

**Marwa Zaatari:**  Mm-hmm.

**Keith Garris:**  Well, Marwa, what I, I've dumbed this down to you, say if I take an apple and sit it on the counter, it will turn brown…

[00:21:00]

**Keith Garris:**  …over a, say it turns completely brown in one hour.  If I take a household fan and I blow air onto that apple, it will turn brown in minutes.

**Marwa Zaatari:**  Yes.

**Keith Garris:**  Does that make sense?

**Marwa Zaatari:**  Yes.

**Keith Garris:**  Okay.  So, what GU, so when I was presenting and the management said, "What about blah, blah, blah?" and I said, "Uh, uh, who did the testing?"  "We understand one of your sales guys," and I had to stand right there.  I didn't have a lot to say…

[00:21:30]

**Keith Garris:**  …because it was, well, what do I say?  I'm an idiot? And I'm standing behind GPS?  And I did the testing?

Well, and the, and the management says, "Well, we had a sales guy do it," and then they, then they kind of nodded at me, not, not to wave my hand and say I was the guy.  We should have had a sales guy, but it didn't matter if you had any, you, you, you had a janitor doing it.  It didn't matter, right?  It was the testing, it was the testing, it was the testing.

So, um, if you just blow air on a virus, it will…

[00:22:00]

**Keith Garris:**  …dry.  Get hard, brittle, crack, break, and, and die off, whether it, without any PCO or hydrogen peroxide, anything like that, or ionization.  And it, you know, viruses will die.  Some will last 24 to 48 hours, as we know, on surfaces in space—

**Marwa Zaatari:**  Uh, but the case, when—

63

**Keith Garris:**  —but eventually it dies.

**Marwa Zaatari:**  —case, when they do, one second, when they do the natural decay experiment that Innovative Bioanalysis lab, don't also they have the fan on?

**Keith Garris:**  Yes, and blowing on…

**[00:22:30]**

**Keith Garris:**  …the Petri dish.  Right?  Blowing directly onto the Petri dish.

**Marwa Zaatari:**  Yeah.  But I mean, with and without the GPS device, you still have the fan on?

**Keith Garris:**  Yes.

**Marwa Zaatari:**  Yeah.

**Keith Garris:**  Well, they, they, and they did it with the GPS.  They didn't do it without GPS on.  If you turn the GPS unit on and just blew it onto it, when we did the testing in the, in the universities' labs at Boeing's approved universities, um, we had the fans in the center of the room.

**[00:23:00]**

**Keith Garris:**  Matter of fact, we had two.  They weren't blowing—

**Marwa Zaatari:**  Yes.

**Keith Garris:**  —directly on the dishes itself.

**Marwa Zaatari:**  Mm-hmm.

**Keith Garris:**  They were just filling the room.  So GPS says, "Well, guys, it's like this.  We know ions last 60 to 90 seconds.  So it's like filling a balloon up with ionized air with bipolar ionization,

positive and negative ions.  And that balloon, you tie it and, in a knot, and the balloon holds the air."

Well, the, the, he goes, "The ions are going to die off in 60 to 90 seconds."  That was, that was Boeing's test.  And I'm just sitting there looking at them…

**[00:23:30]**

**Keith Garris:**  …cross-eyed, like, are you out of your mind?  We ran fans at continued, got in a car, we, we blew, we blew fans with ionization's unit in it, nonstop, for two hours.  It wasn't a balloon— (laughs)

**Marwa Zaatari:**  Yes.

**Keith Garris:**  —example.

**Marwa Zaatari:**  Yeah.

**Keith Garris:**  They, they did cover the exhaust, and they said, "Well," we weren't getting, we weren't getting, uh, uh, on the experiments, they said, "Well, we didn't get exhaust…

**[00:24:00]**

**Keith Garris:**  …to get, um, exhaust the air out of the room."  It didn't matter, Marwa.

**Marwa Zaatari:**  Yes.

**Keith Garris:**  I was running bipolar ionization 80 to 90 thousand positive-negative ions for two hours.  The second series—

**Marwa Zaatari:**  It didn't matter.

**Keith Garris:**  —of tests, I, we knew that negative ions were the ones that were going to, straight negative ions were the, negative ions were the ones that would break down the hydrogen molecule and will break down viral load.

**[00:24:30]**

**Keith Garris:**  And so we, I suppressed the positive ion emitter in both fans and turned it on and I had 632,000 negative ions running for two hours in that room.  And it's a standard 15-foot room by 8-foot ceiling.  Right?

And, that was straight negative ions.  The first test was 80 to 90,000 that we recorded with our ion meters and we took the data log off of it, the SD card.  And that's how we did the report.

**[00:25:00]**

149.  Defendant's claims were material to Plaintiff and the Class Members but Defendant did not disclose to purchasers of the Products that the devices were defective and unable to fulfill many of Defendant's advertising claims. As a result, Plaintiff and the Class Members purchased devices that they would not have otherwise purchased or for which they would have paid less. Many Class Members relied on Defendant's assertions that the Products were capable of producing specific outcomes—e.g., creating a safe environment by safely eradicating the COVID-19 virus —and received devices that were unfit for the purposes for which they were purchased.

150.  Defendant intended to deceive consumers in order to increase its revenues and profits.

151.  Defendant's suppression of the truth led to exponential growth in revenues and profits.[103]

---

[103] *Global Plasma Solutions Inc v. D Zine Partners LLC*, 3:21-cv-00884, (N.D. Tex.), ECF No. 376-1, pp. 151-52.

**Keith Garris:**  …you know, the technology that is going to help solve the problem."  Um, my, most of our quotas for the year were like 1.5 million dollars.  The year before my territory, most people's territories did 2, 300 thousand, wasn't even enough to pay for ourselves, of course we were making 80 to 90% margin.  But they were willing to spend the money for the people, the, the resources, me and everybody else…

**[01:03:30]**

**Keith Garris:**  …to build this business, right?  And they and Falfurrias had millions and millions dollars they were willing to spend for its effort to, um, bring people in, like me and other people, um, sales to grow it.  Of course, we had quotas to meet and, um, my quota and everybody's quotas are, give or take, was $1.5 million.  On June 9th, I'll tell you specifically the date 'cause I remember like it was last week came and we were waiting, waiting and waiting and all of sudden says, "Guys, this went…

**[01:04:00]**

**Keith Garris:**  …national news."  Right?  We, um, we, we, we killed, um, 99.4% on Tuesday night.  Wednesday, Thursday, and Friday, we all did our annual quota in sales.

**Marwa Zaatari:**  Wow.

**Keith Garris:**  Each day.

**Marwa Zaatari:**  Wow.

**Keith Garris:**  Each day consecutively.

**Marwa Zaatari:**  Each day?

**Keith Garris:**  It's good for me and my pocketbook, right?

**Marwa Zaatari:**  This is all because of the press release, right?  This is for the, this

**[01:04:30]**

**Keith Garris:**  We probably taking 3, 4 million dollar a month company into, uh, 30, 40, 50 million a month.

**Marwa Zaatari:**  But this June 9th, it was after the press release that say that.

**Keith Garris:**  Yes.

**Marwa Zaatari:**  This company removes 99.4% and it's [inaudible]…

**Keith Garris:**  I think it went out like in MSNBC and Forbes and stuff like that.  It's cra-.  I was really aware of the, the avenues and channels it went through, but yeah, that was, isn't that crazy?

**Marwa Zaatari:**  That's crazy.

**Keith Garris:**  It was good for me, right?

**Marwa Zaatari:**  Yes.

**Keith Garris:**  Because I had, I had unlimited commission.  Oh, I, I hit my full year's commission on Wednesday…

**[01:05:00]**

**Keith Garris:**  …Thursday and Friday, and I was already there by March, you know, and then April and May was like, "Wow, man, this is crazy money.  Right.  This is awesome."  Oh, it even got worse towards September, October, November, December.

**Marwa Zaatari:**  Yeah.

**Keith Garris:**  I mean there was weeks that I made more money in a week and some people made more money in a week.

**Marwa Zaatari:**  Yeah.

**Keith Garris:**  Than they made in the last five years of their life.

152.  Defendant's "profits over people" scheme won the company acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members across the country and in violation of all applicable laws referenced herein.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

153.  Any applicable statute of limitations has been tolled by Defendant's false representations concerning the performance and

quality of the Products, and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding the Products and could not have reasonably discovered that the Products did not conform to the Defendant's representations.

154.  Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the performance and efficacy of the Products. As alleged herein, the presence or risk of COVID-19 virus was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Members of the Class would not have discovered through the existence of reasonable diligence that the Products did not work to eliminate the COVID-19 virus.

155.  At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Products.

156.  Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendant's knowing, active, and affirmative concealment.

157.  For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statues of limitations in defense of this action.

## FACTS SPECIFIC TO PLAINTIFF

158.  On December 18, 2020, Plaintiff purchased Defendant's GPS-24-FC Ionization System from R. Brooks Mechanical, located in Rising Sun, Maryland.

159.  Plaintiff paid approximately $750.00 for the device and installation.

160.  Plaintiff had the device installed in his home for use at his home.

161.  Plaintiff was in the market for a device to improve air quality, particularly one that would mitigate the effects of COVID-19.

162.  Prior to purchasing, Plaintiff had observed and read Defendant's representations on its website, brochures, interviews,

articles, videos, and social media that its Products could clean the air, effectively attack COVID-19, and supported by sound independent testing. Further, Plaintiff observed and read similar representations that were repeated by distributors and sellers of the Products.

163.  Plaintiff has seen Defendant's representations regarding Defendant's superior air treatment system, which persuaded him to keep using the device.

164.  At all relevant times, Plaintiff used and maintained the unit as would any reasonable consumer and in accordance with Defendant's instruction.

165.  At no point during his ownership or use of the Product did Plaintiff notice any improvement in the air quality and continued to endure the presence of airborne irritants, despite Defendant's claim that its Products would improve air quality.

166.  Plaintiff fears future injury and physical harm for himself, family members, friends, and other people that may have been exposed as a result of his use of Defendant's Product.

167.  He would not have purchased the Product if he had known about the defects or that Defendant was misrepresenting the

performance, capabilities, and benefits of the Product. In particular, he would not have purchased the Product if he had known that Defendant's representations were false and that Defendant concealed the product's defective nature.

168.  Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice, attached as Exhibit 1, concerning the defects described herein and consumers' experiences with the defects to Defendant.

## **CLASS DEFINITIONS AND ALLEGATIONS**

169.  Plaintiff, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), brings this action on behalf of the following classes (collectively, the "Class," "Classes," and "Class Members"):

> **National Class:** All persons in the United States who purchased the Products.
>
> **Consumer Protection Multi-State Class:** All persons in the States of California, Delaware, Florida, Illinois, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, New York, Pennsylvania, Texas, and Washington who purchased the Products.[104]

---

[104] The States in the Consumer Protection Multi-State Class are limited to those States with similar consumer protection laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, et seq.); Delaware (6 Del. C. §§ 2511, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. 407.010, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New York (N.Y.

**Delaware Subclass:** All persons in the State of Delaware who purchased the Products within the state or from the state.

170. Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof.

171. The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.

172. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a. whether Defendant misrepresented material facts concerning the Products;

---

Gen. Bus. Law § 349, et seq.); Pennsylvania (73 Pa. Stat. Ann. §§ 201-1 et seq.); and Washington (Wash Rev. Code § 19.86.010, et seq.).

b. whether Defendant misrepresented material facts concerning the Products in the marketing of every Product;

c. whether Defendant's conduct was unfair and/or deceptive;

d. whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the classes;

e. whether Plaintiff and the Classes are entitled to equitable and/or injunctive relief;

f. whether Defendant breached express warranties to Plaintiff and the Classes;

g. whether Defendant breached implied warranties to Plaintiff and the Classes;

h. whether Plaintiff and the classes have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

173. Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Classes, purchased

Defendant's Products in reliance of Defendant's misrepresentations and omissions. Plaintiff sustained damages from Defendant's wrongful conduct.

174.  Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

175.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device

presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

176.   The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

177.   The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### Deceit and Fraudulent Concealment
### (On Behalf of the National Class and, alternatively, the Delaware Subclass

178.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76

179.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

180.  Defendant made false representations concerning the performance and quality of the Products, and the quality of the Defendant's brand. Further, Defendant concealed and suppressed material facts concerning the performance and quality of the Products, the quality of the Defendant's brand, the Products' capabilities and benefits, and the Products' defects. Defendant knew, or in the exercise of reasonable diligence should have known, of the defects and misrepresentations of the capabilities and benefits of the Products but failed to disclose these facts prior to or at the time it marketed Products and sold them to consumers. Defendant engaged in this concealment in order to increase sales of its Products and command a higher price for its Products.

181.  Plaintiff and Class Members had no reasonable way of knowing that Defendant's representations were false and misleading, or that Defendant had omitted to disclose highly important details relating to the Products' performance and the defects. Plaintiff and

Class Members did not and could not reasonably discover Defendant's deception on their own.

182.   Defendant had a duty to disclose the true performance of the Products because the scheme and its details were known and accessible only to Defendant; Defendant had superior knowledge and access to the relevant facts; and Defendant knew these facts were neither known to, nor reasonably discoverable by, Plaintiff and the Class Members.

183.   Defendant still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the true performance of the Products.

184.   Plaintiff and Class Members were unaware of the omitted material facts and would not have purchased the Products had they known of the facts Defendant suppressed. Plaintiff's and Class Members' actions in purchasing the Products were justified. Defendant was in exclusive control of the material facts and such facts were not reasonably known to the public, Plaintiff, or Class Members.

185.   Plaintiff and Class Members relied to their detriment upon Defendant's representations, fraudulent misrepresentations, and material omissions regarding the quality of the Products, the Products'

effectiveness, and the Products' defects in deciding to purchase their devices.

186.   Plaintiff and Class Members sustained damage as a direct and proximate result of Defendant's deceit and fraudulent concealment. Among other damages, Plaintiff and Class Members did not receive the value of the premium price they paid for their Products. Plaintiff and Class Members would not have purchased Products – or would have purchased them at a much lower price – had they known of the Products' inability to safely and effectively cleanse the air of the COVID-19 virus owing to the defects.

187.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being, to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
## Breach of Express Warranty
## (On Behalf of the National Class and, alternatively, the
## Delaware Subclass)

188.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

190.  Defendant created an express warranty within the meaning of the U.C.C. and the respective state statutes under which Plaintiff alternatively assert this claim.

191.  In particular, Plaintiff and Class Members, who purchased the Products received materially similar, if not identical, written warranties from the Defendant.

192.  At all relevant times, including prior to and at the time of their purchases of Products, Plaintiff and Class Members relied on Defendant's claims, promises, and representations. These promises were part of the basis of the bargain connected with these transactions for the sale of goods, and thus qualify as "express warranties" as defined by the U.C.C.

193. Defendant breached its express warranty by:

    a. selling Plaintiff and Class Members Products that were unable to safely and effectively cleanse the air after representing that the Products use "the safest, most effective technology on the market" which "is effective against COVID-19."

    b. Selling Plaintiff and Class Members Products that had representations that were supported by independent studies conducted in real world conditions;

    c. selling Plaintiff and Class Members Products containing defective materials responsible for the defects, which caused the Products to fail to function properly; and

    d. failing to adequately repair or replace Products affected by these defects.

194. Defendant did not furnish an effective remedy to Plaintiff and Class Members. Despite opportunities to honor the promises in its express warranty, Defendant failed to provide Plaintiff and Class Members with conforming Products free of defects and failed to repair

the Products to make them conform to the representations made at the time of sale.

195.   Plaintiff and Class Members experienced the defects within the warranty period. In breach of its express warranty, Defendant failed to inform Plaintiff and Class Members that the Products contained defective materials and workmanship and failed to replace or repair the defective Products.

196.   Defendant breached its express warranty that promised to replace or repair and correct manufacturing, materials or workmanship defects, and to provide Products conforming to the warranties. To date, Defendant has not replaced nor repaired or adjusted the Products, and has been unable to repair or adjust, the defects in the Products.

197.   Through advertisements, public statements, and other statements disseminated through print and online media, Defendant expressly warranted several attributes and qualities of the Products by representations as detailed above, such as:

   a. "[Products use] the safest, most effective technology on the market."

   b. "[Product] is effective against COVID-19."

c. "[Product is] completely safe for humans and animals."

d. "[Product has] no health concerns."

e. "[Product is] a safe, effective solution."

f. "[Product is] unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces."

g. "[Product] is proven by independent laboratory testing."

198. Class Members were exposed to and relied on the foregoing statements when they decided to buy the Products. Accordingly, Defendant's express warranties formed part of the basis of the bargain that was reached when Plaintiff and Class Members purchased their Products.

199. Defendant breached these express warranties because the Products did not, in fact, use "the safest, most effective technology on the market" that were "effective against COVID-19." Defendant failed to adequately repair or replace Plaintiff's and Class Members' Products when they reported that they suffered from the defects during the warranty period. Despite reasonable opportunities to honor the promises in its express warranties, Defendant failed to provide Plaintiff and Class Members with conforming, non-defective Products.

200.  Defendant received timely notice of the breaches experienced by Plaintiff and Class Members. Defendant had exclusive knowledge of the defects before the Products were sold. Defendant also received notice of the defects by the large volume of complaints lodged by concerned citizens and consumers about the defects shortly after the product was publicly revealed. These complaints were received directly from consumers as well as from vendors who sold the Products who received the complaints and relayed them to Defendant.

201.  Plaintiff and Class Members used their Products in a manner consistent with the Products' operating instructions. Plaintiff and Class Members performed their duties under the terms of the foregoing express warranties or have been excused from such performance as a result of Defendant's conduct described herein.

202.  Any attempt by Defendant to disclaim or limit its express warranties vis-à-vis consumers would be inappropriate under these circumstances. Any such asserted limitation is unconscionable and unenforceable because Defendant knowingly sold a defective product without informing consumers and because Defendant failed to honor their express promises.

84

203.  As a direct and proximate result of Defendant's breaches of express warranty, Plaintiff and Class Members have suffered economic damages, including costly repairs, loss of use, replacement costs, substantial loss in value and resale value of the Products, and other harm.

## COUNT III
## Breach of the Implied Warranty of Merchantability
## (On Behalf of the National Class and, alternatively, the Delaware Subclass)

204.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

206.  Defendant is a "merchant" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively asserts this claim.

207.  The Products are "goods" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively brings this claim.

208.  Defendant impliedly warranted that the Products were of a merchantable quality. The law implies a warranty that the Products were merchantable in the relevant transactions. The Products, when sold and at all times thereafter, were not in merchantable condition due to the defects and other conditions as alleged above and are not fit for the ordinary purpose for which air treatment systems are used, e.g., to safely cleanse the air of the COVID-19 virus.

209.  At the point of sale, the Products contained unseen manufacturing or materials defects whose manifestation renders the product ineffective. These defects in the Products existed when the Products left Defendant's possession and rendered them unfit for their ordinary and intended purpose. At all relevant times, including when the Products entered the stream of commerce and were purchased by Plaintiff and Class Members, the Products were defective and not capable of functioning as advertised.

210.  Defendant breached the implied warranty of merchantability because the Products are not of a merchantable quality, but instead contained the defects. Had Plaintiff and Class Members known of the

defects, they would not have purchased Defendant's Products, or would have paid less for them.

211.   Plaintiff and Class Members' interactions with Defendant suffice to create privity of contract between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and Class Members are intended third party beneficiaries of contracts (including implied warranties) between Defendant and the retailers who sell the Products. Defendant's warranties were designed for the benefit of consumers who purchased the Products.

212.   As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured and are entitled to damages.

213.   Defendant's attempts to disclaim or limit the implied warranty of merchantability vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the defects.

214.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and the Class Members. Among other things, Plaintiff and members of the Class had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendant knew or should have known that the Products were defective at the time of sale and that the devices were not of merchantable quality.

215.   Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

216.   Defendant was provided notice of these issues. Defendant had exclusive knowledge of the defects before the Products were sold. Defendant also received notice of the defects by the large volume of complaints lodged by concerned citizens and consumers about the defects. These complaints were received directly from consumers as well

as from vendors who sold the Products who received the complaints and relayed them to Defendant.

217.  Additionally, Defendant was aware of these issues by the academic papers, news articles, and other medium which covered the deceptions and defects described herein.

218.  Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice, attached to this Complaint as Exhibit 1, concerning the defects described herein and consumers' experiences with the defects to both Defendant and retailer.

219.  Defendant's breach of the implied warranty of merchantability damaged Plaintiff and Class Members in an amount to be determined at trial.

## COUNT IV
## Breach of the Implied Warranty of Fitness for a Particular Purpose
## (On Behalf of the National Class and, alternatively, the Delaware Subclass)

220.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

221.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

222.  Defendant is a "merchant" as defined under the UCC.

223.  The Product are "goods" as defined under the UCC.

224.  Defendant engaged in a focused marketing campaign to consumers concerned about air quality from the COVID-19 pandemic and has reason to know that Plaintiff and Class Members purchased the Products for a particular purpose, e.g., to eliminate the COVID-19 virus, and that Plaintiff relied on Defendant's skill or judgment to furnish devices that accomplished that purpose and others.

225.  Plaintiff did in fact rely on Defendant's skill or judgment to furnish devices that accomplished that purpose and others.

226.  Defendant breached the implied warranty of fitness because the Products were incapable of satisfying that purpose, among others, due to the defects and other conditions as alleged above.

227.  Plaintiff was harmed by Defendant's breach of the implied warranty of fitness by, inter alia, overpaying for the Products.

228.  Plaintiff and Class Members' interactions with Defendant suffice to create privity of contract between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and Class Members are intended third party beneficiaries of contracts (including implied warranties) between Defendant and the distributors and retailers who sell the Products. Defendant's warranties were designed for the benefit of consumers who purchased the Products.

229.  As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured and are entitled to damages.

230.  Defendant's attempts to disclaim or limit the implied warranty of fitness vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the defects.

231.  The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Classes. Among other things, Plaintiff and members of

the Classes had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendant knew or should have known that the Products were defective at the time of sale and that the devices were not of merchantable quality.

232.  Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

233.  Defendant was provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the defects became public.

234.  Prior to the filing of this Complaint, Plaintiff sent pre-suit notice, attached as Exhibit 1, concerning the defects and other consumers' experiences with the defects.

**COUNT V**
**Violation of State Consumer Protection Statutes**
**(On Behalf of the Consumer Protection Statutes of Multi-State Class)**

235.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

236.  Plaintiff asserts this claim individually and on behalf of the Consumer Protection Multi-State Class.

237.  The Consumer Protection Acts of the States in the Consumer Protection Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

238.  Defendant intended that Plaintiff and each of the other members of the Consumer Protection Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

239.  As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff, and each of the other members of the Consumer Protection Multi-State Class, have sustained damages in an amount to be proven at trial.

240.  In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT VI
### Violation of the Delaware Consumer Fraud Act ("DCFA"), Del. Code Ann. Tit. 6 §§ 2511, *et seq.* (On Behalf of the Delaware Subclass)

241.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

242.  Plaintiff asserts this claim individually and on behalf of the Delaware Subclass.

243.  This cause of action is brought pursuant to the Delaware Consumer Fraud Act ("DCFA"). 6 Del. C. §§ 2511, *et seq*. The express purpose of the DCFA is to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices" and it is the "intent of the General Assembly that such practices be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies." 6 Del. C. § 2512.

244.  The DCFA declares unlawful "the act, use, or employment by any person of any deception, fraud, false pretense, false promise,

94

misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged." 6 Del. C. § 2513.

245.  Both Plaintiff and Defendant are a "person" as defined by the DCFA. 6 Del. C. § 2511(7).

246.  Defendant's Products are "merchandise" within the meaning of the DCFA. 6 Del. C. § 2511(6).

247.  The DCFA declares certain actions as unlawful "unfair practices." 6 Del. C. § 2511(9). Defendant's unfair or deceptive trade practice in violation of the DCFA includes "any act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves." 6 Del. C. § 2511(9).

248.  As set forth more thoroughly above, Defendant's claims are false, deceptive, and misleading to consumers because Defendant's Products do not safely clean the air of the COVID-19 virus.

249.  Plaintiff has standing to pursue this claim because he has been injured by virtue of suffering a loss of money and/or property as a

result of the wrongful conduct alleged herein. Plaintiff would not have purchased Defendant's Products (or paid a premium for them) had he known the truth concerning the Products' defects. As a direct result of Defendant's actions and omissions of material facts, Plaintiff and Delaware Subclass members did not obtain the value of the products for which they paid; were induced to make purchases that they otherwise would not have; and lost their ability to make informed and reasoned purchasing decisions.

250.  The damages suffered by Plaintiff and the Delaware Subclass were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant as described above.

251.  Plaintiff and the Delaware Subclass make claims for actual damages, attorney's fees and costs. MD Code Ann. §§ 13-408.

## COUNT VII
## Unjust Enrichment
### (On Behalf of the National Class and, alternatively, the Delaware Subclass)

252.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

253.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

254.  At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

255.  The Products purchased by Plaintiff and the Class Members did not provide the promised performance and instead contained uniform defects.

256.  Plaintiff and Class Members conferred upon Defendant non-gratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing.

257.  Defendant received funds directly from consumers and through the distribution and sale of the Products.

258.  Proceeds from sales of the Products – including Plaintiff's purchase – were received by Defendant.

259.  These proceeds benefited Defendant by boosting its sales revenue and its bank accounts with ill-gotten gains premised from deceptive conduct.

260.  Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiff and Class Members, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and Class members were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

261.  At the time of Plaintiff and Class Members' purchases, Defendant knew of the Products' defects and true efficacy. Knowing that their representations were false, Defendant sold the Products to Plaintiff and Class Members at a premium price. Accordingly, Defendant continues to retain a benefit improperly obtained to the detriment of Plaintiff and Class Members.

262.  Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

263.   Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class Members for their unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b.  For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.  For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d.  For an order requiring Defendant to immediately cease and desist from selling its misbranded Products in violation of law; enjoining Defendant from continuing to label, market,

99

advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For pre-judgment and post-judgment interest on all amounts awarded;

f. For an order awarding punitive damages;

g. For an order awarding attorneys' fees and expenses and costs of suit; and

h. Granting such other relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: June 27, 2023                    Respectfully submitted,

OF COUNSEL:                             FARNAN LLP

REICH & BINSTOCK LLP          */s/ Michael J. Farnan*
Dennis C. Reich, Esq.              Brian E. Farnan (Bar No. 4089)
4265 San Felipe, Suite 1000     Michael J. Farnan (Bar No. 5165)
Houston, TX 77024                  919 N. Market St., 12th Floor

Phone: (713) 622-7271
Fax: (713) 623-8724
dreich@reichandbinstock.com

THE MILLS LAW FIRM
Michael A. Mills, Esq.
8811 Gaylord Drive
Suite 200
Houston, TX 77024
Phone: (832) 548-4414
Fax: (832) 327-7443
mickey@millsmediation.com

THE KEETON FIRM LLC
Steffan T. Keeton, Esq.
100 S Commons, Ste. 102
Pittsburgh, PA 15212
1-888-412-5291
stkeeton@keetonfirm.com

Wilmington, DE 19801
Phone: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff and the Classes*

101